## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

SHELBY NAVE,                          )
                                      )
                Plaintiff,            )
                                      )
v.                                    )        Case No. CIV-17-096-KEW
                                      )
INDEPENDENT SCHOOL DISTRICT           )
NO. 20 OF LEFLORE COUNTY a/k/a        )
PANAMA PUBLIC SCHOOLS;                )
RYAN ENGLAND, individually            )
and in his official capacity;         )
and GRANT RALLS, individually         )
and in his official capacity,         )
                                      )
                Defendants.           )

## OPINION AND ORDER

This matter comes before the Court on Defendant School District's Motion for Summary Judgment (Docket Entry #79) and Defendant Grant Ralls' Motion for Summary Judgment (Docket Entry #80).

### Facts Relevant to All Claims

Defendant Ryan England ("England") began his employment with Defendant Independent School District No. 20 of LeFlore County a/k/a Panama Public Schools ("School District") during the 2012-13 school year. During his application process, Defendant Grant Ralls ("Ralls"), the then superintendent of the School District, inquired of England's prior employer, the Byng School District. Finding no problems, Ralls recommended that England be hired as the agriculture teacher. The School District's Board of Education voted to hire England in that capacity.

England served as Plaintiff Shelby Nave's ("Nave") agriculture teacher and Future Farmers of America ("FFA") advisor during her time in high school. Nave served as president of the School District's FFA chapter during her sophomore, junior, and senior years and was active in FFA activities, including showing livestock and judging plants.

Nave stated that England gave hugs to who were considered his favorite students which consisted of about twelve students - ten boys and two girls, including Nave. During Nave's sophomore year, England began "flirty talk" or making dirty jokes with his favorite students. An example of such jokes would include talking about "banging students' moms. Like having sex with students' moms . . . ." These comments were made by England in front of students, some of the students' parents, Ronnie Oschlager, an assistant in the agricultural class Nave's junior year, and Tyler Spencer ("Spencer"), an assistant in the class Nave's senior year. The comments were also made in front of one of the school board members for the School District, Carlus Call ("Call"), who was also a parent of an agricultural student in England's class.

At the beginning of Nave's junior year, however, the communications between Nave and England became more sexual in nature. England became more "flirty" with Nave and talked "like you would flirt with somebody that you wanted to date or, like, be with." Nave believed similar communications were occurring with

2

another female student identified as "MA". These communications were done exclusively in front of students.

On or about October 7, 2014, however, England told Nave that he "got bored last night, so I took a dick pic and it's just on my phone." He then put his cell phone down and told Nave it was unlocked and all she had to do was swipe left. Nave swiped the phone and observed a picture of England's penis on the cell phone. Nave told MA of the picture in November or December of 2015.

On or about October 10, 2014, England drove Nave to a football game in Foyil, Oklahoma. When England drove Nave to the football game, he was alone with her. While at the game, England visited with Richard Haynes, principal of Panama High School ("Haynes"), Ralls, and Call. All of the band members and their parents were also present. Nave testified that all of these individuals observed her getting out of England's truck before the game and getting into his truck after the game.

When the game concluded, Nave and England went to the agricultural building to drop off a trailer. He offered to drive Nave around before taking her home. He offered to give Nave a back rub to which she agreed. While massaging Nave, England grabbed her butt.

Nave states that she liked England and did not want to get him in trouble so she did not tell anyone of the back rub. She was interested in him in a sexual nature because she "thought he was

hot." However, she did not expect the relationship to proceed further.

Nave and England began Snapchatting with one another. England asked Nave to send him a nude picture of herself. Nave sent him a picture of her bare breasts. In return, England sent Nave pictures of his bare torso and his face. No other pictures were exchanged between the two but their Snapchat exchange continued through "hundreds" of messages.

Nave next stayed after school to help England. After mentioning "something about seeing (sic) naked person," England pulled out his penis and Nave removed her shirt. Nave performed oral sex on England. During this time, Nave only informed MA of her sexual relationship with England. MA informed Nave that she was also having relations with England and that he had communicated that he had feelings for MA.

Nave performed oral sex on England once or twice a week in various locations throughout the school, during off school property FFA events, and in the ag truck and trailer. However, during Christmas break of that year, England again gave Nave a back rub but then proceeded to have vaginal sex with her for the first time. Thereafter, Nave and England had sexual intercourse once or twice a month. Half of the instances where Nave and England engaged in either oral sex and sexual intercourse were done during the school day and sometimes with students and teachers in the vicinity.

On one occasion, Nave and England were engaging in oral sex in an ag room at the school when a bus mechanic, Ronnie Bell, walked by the window. Nave and England covered up and walked out of the room. Bell came back and was hiding behind a door and jumped out and scared Nave. Nave believed Bell could see she and England through the window. Bell is also England's uncle and President of the Ag Booster Club at the school.

In the spring and summer of 2015, Nave told several friends of her relationship with England. She asked that they keep it secret because she did not want to get England in trouble and believed she was in love with him.

In October of 2015, Nave told another girl identified as "SH" of her relationship with England because SH told her she had heard a rumor of the relationship. SH was the daughter of Haynes. She expected SH to keep the relationship secret. SH began watching Nave and England but did not see anything inappropriate. On three occasions, Nave told SH and other members of the basketball team in the locker room that "she had business to take care of when the bus routes got done" and could not go with the other girls to eat. SH believed that Nave and England were going to have sex after he completed his bus routes.

In the fall of Nave's senior year, Nave perceived England began acting hateful toward her, although the sex continued. She felt he was hateful to her around other people and was not treating

her as he had when the relationship began. She stated that he stopped giving her special privileges. She informed her mother, Kimberly Maxwell ("Maxwell"), that England was treating her differently but did not tell her of the sexual relationship. Nave believed she was going to fail a college class she was taking because she missed her final. Maxwell "chewed her out." Nave told her mother that she had been contemplating suicide. The next day on December 16, 2015, Maxwell went to see Haynes at the high school. The mother told Haynes that she believed Nave was not happy because she was not getting as much playing time in basketball. She also told him that England was being awful to Nave and that ag was not going well. She told Haynes that "it's just kind of like they broke up." She stated that "ag was good and then all of a sudden it wasn't good." At the time, neither Haynes nor Maxwell knew of Nave and England's sexual relationship.

On the night of December 16, 2015, SH proceeded to tell her youth sponsor at church who was married to the youth pastor at the church of Nave's relationship with England. The sponsor told her husband of the relationship and the youth pastor called the school on December 17, 2015. Ralls and Haynes then began an investigation of the allegations. Ralls interviewed SH. Ralls and Haynes interviewed other students. The interviews were recorded. Ralls telephoned Maxwell and told her that he had received a report that Nave was involved with a teacher and asked if she wanted to be

present during Nave's interview.

Ralls and Haynes interviewed Nave. Maxwell was present for portions of the interview. Nave asked that her mother leave and then denied that a relationship existed with England. Nave perceived that Ralls and Haynes were trying to figure out what was going on. They stated that they were going to move Nave out of classes around England due to the allegations. Nave did not want to be moved out of the ag class because she needed it to get her State degree.

Nave told Ralls and Haynes that it was actually another guy who she was "hooking up with." Ralls and Haynes sent Nave home with her mother after the interview.

Ralls and Haynes next interviewed England. England denied any inappropriate behavior with Nave. Ralls told England to go home and not to come to work the next day. England turned in his keys to the school before leaving.

Ralls called the Panama Police Department and reported the allegations of a sexual relationship between England and Nave. The police contacted Maxwell and asked her to take Nave to the Child Advocacy Center for a forensic interview. During the interview, Nave admitted to a sexual relationship with England. Upon being informed of Nave's admission, Ralls notified England that he was suspended from teaching with pay. A criminal investigation by police revealed England's DNA in the various places Nave stated

that she had sex with him.

Nave testified that the School District and Ralls "treated me like I was the one who was at fault." Before the relationship was revealed, Nave stated that she saw Ralls in the hallway at the school all the time and they would exchange "a little hey how are you kind of thing." After the report, Ralls "wouldn't make eye contact with [her], he wouldn't talk to [her], anything like that." Nave felt that she was treated differently by Haynes, Ralls, Ms. Joy, Call, and his wife, and Ronnie Bell.

Nave stated that she felt like she was "dragged" into Ralls' office, that Maxwell was going to be excluded from her interview, and that she knew that, but for her mother's intervention, England was going to be permitted to return to the school to teach after Christmas break. In fact, Nave was asked to come into the office to be interviewed, her mother was asked to leave by Nave herself, and England was never permitted to return to the school to teach.

Nave also testified that she felt she had to "mind my Ps and Qs" because if she "stepped one toe out of line", Haynes would discipline her. She used as an example a situation where she was working as an office aide at the school a couple of weeks after the disclosure of her relationship with England and told a secretary of a dream she had where she was naked on a beach and her basketball coach was asking her to sit on his lap. The dream was reported to the administration and they, in turn, reported the incident to the

Child Advocacy Center, the police, the district attorney, and England's criminal defense attorney. Nave was removed as a school office aide.

Another incident of alleged retaliation or intimidation occurred when at a Senior Night basketball game, Nave was called and told that the School District, and specifically Ralls, had given England permission to attend the game where Nave would be present to watch his five year old daughter perform a cheer routine at half time. Additionally, after the relationship between England and Nave came to light, England's wife was allowed to come to Nave's basketball practice and went around the gym talking to teachers in Nave's presence. England's wife was also allowed to go to ag shows to help students get ready for the show. Call would talk to her at the shows and was allegedly aware of her presence.

Spencer took over for England after his removal from the school. Nave testified that Spencer was not helpful and made her feel she could not talk to him. She stated she was President of FFA her senior year and the state FFA had a recognition dinner for Academic Excellence which she should have attended to receive an award. Spencer failed to tell Nave of the dinner, Nave missed the event, and others asked why she did not attend. Nave testified that students talked about the investigation into the criminal case against England in Spencer's class without repercussions. Maxwell testified that a student heard Spencer tell a student "I would hug

you, but today, in this day and time, that would be considered rape." Nave was upset by the incident. The student was suspended from competing in the ag shows until Maxwell intervened and asked that he be reinstated.

Nave testified that the school counselor would not permit her to go to private counseling for sexual molestation during school hours. The counselor stated that she had 200 students and could not make an exception for one.

Nave testified that Call's daughter began distancing herself from Nave after the relationship with England was reported. She stated Call and his wife posted on social media that England was a great teacher and "things like that."

The School District's student handbook addresses the policy for reporting Title IX sexual harassment, intimidation, bullying and threatening behavior by a student. It does not direct a student on how to address sexual harassment by a teacher. According to Haynes, it was not included because such a prohibition would be "common sense upon the profession that you're in." Haynes testified that he conducts an orientation at the beginning of the school year and makes "a more general statement as far as teacher conduct . . . and expectations." Haynes stated that he did not learn of the allegations against England until December 17 and stated he did not know if England actually molested Nave.

On July 8, 2016, second degree rape felony charges were filed

against England.  On August 1, 2016, the Oklahoma State Department of Education notified England that it had suspended his teaching certificate.  On August 8, 2017, a Judgment and Sentence was entered in the criminal case after England plead "no contest" to the charges.  England received a suspended sentence of five years and was required to register as a sex offender.  England resigned from employment with the School District.

## Procedural Posture

This case was removed to this Court on March 10, 2017.  It was originally initiated by Nave in the District Court in and for LeFlore County, Oklahoma on February 1, 2017.  After subsequent amendments in this Court, Nave alleged the following claims[1]: (1) School District - (a) violation of Title IX of the Education Amendments of 1972, (b) violation of Title IX in retaliating for bringing a claim, (c) violation of Nave's Fourteenth Amendment rights under 42 U.S.C. § 1983 in failing to protect Nave from sexual harassment so that her property interest in an education was not protected and failing to have appropriate policies in place to insure that protection, (d) violation of Nave's First Amendment rights under 42 U.S.C. § 1983 by retaliating against her after she reported the sexual harassment, and (e) negligence ; (2) Ralls, individually - (a) violation of Nave's Fourteenth Amendment rights

---

[1]  Nave originally brought claims against Ralls, in his official capacity, and for violation of Title IX in his individual capacity. United States District Judge Ronald A. White dismissed those claims by Order entered September 4, 2018.

under 42 U.S.C. § 1983 in failing to protect Nave from sexual harassment so that her property interest in an education was not protected and failing to have appropriate policies in place to insure that protection, and (b) violation of Nave's First Amendment rights under 42 U.S.C. § 1983 by retaliating against her after she reported the sexual harassment; and (3) England – (a) violation of Title IX of the Education Amendments of 1972, (b) violation of Nave's Fourteenth Amendment rights under 42 U.S.C. § 1983 in failing to protect Nave from sexual harassment so that her property interest in an education was not protected and failing to have appropriate policies in place to insure that protection, (c) violation of Nave's First Amendment rights under 42 U.S.C. § 1983 by retaliating against her after she reported the sexual harassment, (d) assault and battery, and (e) intentional infliction of emotional distress.

The School District filed for summary judgment on the claims asserted against it contending (1) it has no Title IX liability because it was not put on actual notice of England's sexual contact with Nave prior to December 17, 2015 through an appropriate person to be put on notice and Nave was not deprived of access to an education; (2) it cannot be held liable for Title IX retaliation because it did not orchestrate or condone any such retaliation by students or teachers; (3) the § 1983 claims must be denied because no official custom, practice, or policy has been shown to deprive

Nave of her constitutional rights; and (4) Nave's negligence claim must be dismissed because England's actions were not foreseeable.

Ralls contends he is entitled to summary judgment because (1) on Nave's Fourteenth Amendment claim, Nave cannot demonstrate Ralls acted deliberately and intentionally to violate her constitutional rights, he was not personally involved in harassment, and Nave has not shown a policy which harmed her for which Ralls was responsible; (2) on Nave's First Amendment claim, Nave cannot show Ralls personally retaliated against her and that a policy for which Ralls was responsible lead to a violation of Nave's constitutional rights; and (3) Ralls is entitled to qualified immunity.

### Standard on Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Universal Money Centers v. A.T. & T., 22 F.3d 1527, 1529 (10th Cir.), *cert. denied*, 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994). The moving party bears the initial burden of showing that there is an absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for

a jury to return a verdict for that party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed 2d 202 (1986). In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. <u>Applied Genetics v. Fist Affiliated Securities</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>Posey v. Skyline Corp.</u>, 702 F.2d 102, 105 (7th Cir. 1983).

## Claims Against the School District

### 1) Title IX

Title IX of the Education Amendments of 1972 states that, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX makes actionable sexual harassment of a student by a teacher when the student can demonstrate that (1) an "appropriate person"; (2) had actual notice of sexual harassment or discrimination; and (3) acted with deliberated indifference in failing to respond to the harassment. <u>Gebser v. Lago Vista Ind. Sch. Dist.</u>, 524 U.S. 274,

289-90 (1998). An "appropriate person" is defined by the Court as "at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." Id. at 290. Further, clarification of the appropriate elements was set out by the Supreme Court in Davis v. Monroe County Bd. of Educ., 526 U.S. 629 (1999). The Court determined Title IX required a showing that (1) an official is deliberately indifferent to sexual harassment (2) of which there was actual knowledge; (3) and the harassment "is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Id. at 650.

Subsequent interpretation of these cases indicates that while "actual notice requires more than a simple report of inappropriate conduct by a teacher . . . the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student." Escue v. Northern OK College, 450 F.3d 1146, 1154 (10th Cir. 2006) citing Doe v. Sch. Admin. Dist. No. 19, 66 F.Supp.2d 57, 62 (D.Me. 1999). The Tenth Circuit acknowledged that "the district courts that have examined the issue have required that the school have 'actual knowledge of a substantial risk of abuse to students based on prior complaints by other students.' Id. (citations omitted). The Court further found that "[p]rior instances need not be 'clearly credible [because] . . . [a]t some

point . . . a supervisory school official knows . . . that a school employee is a substantial risk to sexually abuse children.'" Id. (citations omitted).

Under the stated definition, Bell, a bus mechanic, England's uncle, and President of the school's Ag Booster Club is not an "appropriate person" under Title IX, as Nave urges, as it has not been shown that he has the authority to take corrective action to end the harassment. More troubling is the conduct observed by a school board member, Call which, taken in isolation, might be innocuous but taken as a whole should have provided Call with notice of England's substantial risk to students. Call, who is an "appropriate person" under Title IX, was allegedly present when England made "flirtatious" comments about having sex or wanting to have sex with students' mothers. He also allegedly observed Nave getting in and out of England's vehicle alone at a school-sponsored football game. Such activities place the issue of actual notice in the appropriate purview of the jury as the finder of fact as to whether Call had actual knowledge sufficient to have triggered further inquiry into England's activities. J.M. ex rel Morris v. Hilldale Ind. Sch. Dist. No. 1-29, 397 Fed. Appx. 445, 452-53 (10th Cir. 2010).

The question of deliberate indifference turns on whether the response "to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Davis, 526 U.S. at 648. In

light of the facts known by Call, a reasonable jury could conclude that his lack of action in further investigating the incidents cited was clearly inadequate and deliberately indifferent.

The final element of lack of access to education is somewhat belied by Nave's success in her educational pursuits at the school. However, the standard is whether Nave was deprived of access to an educational opportunity or benefit. <u>Davis</u>, 526 U.S. at 633. Nave and Maxwell testified that Nave became depressed and suffered from anxiety and PTSD. She testified that Call and Ralls offered support for England after the relationship was revealed. Nave testified of the alleged intimidation at her basketball game and that she was not told of an ag banquet. These allegations are sufficient to submit to the jury for consideration of whether Nave suffered an educational deprivation.

**2) Title IX Retaliation**

Title IX prohibits retaliation against individuals who have complained of sex discrimination. <u>Hiatt v. Colo. Seminary</u>, 858 F.3d 1307, 1315 (10th Cir. 2017) citing <u>Jackson v. Birmingham Bd. of Educ.</u>, 544 U.S. 167, 183 (2005). The School District emphasizes that the retaliation must be orchestrated or knew of the harassment and acquiesced or condoned it, citing <u>Miles v. Washington</u>, 2009 WL 259722 (E.D. Okla., Feb. 2, 2009). As a result, the student harassment is not actionable unless the School District acted in concert with it.

For Nave to set out a *prima facie* case of retaliation under Title IX, she must show (1) she engaged in protected activity, (2) she suffered an adverse action, and (3) a causal connection existed between the protected activity and the adverse action. <u>Hiatt</u>, 858 F.3d at 1316. Nave engaged in the protected activity of reporting her relationship with England. The acts of retaliation to which Nave testified did not involve students but rather included actions by Ralls, Haynes, and others in administration in permitting England and his wife to attend events which the School District knew Nave was also attending, actions by teachers in failing to inform her of an honoring dinner, removing Nave as an office aide, and their alleged ostracizing of her after the report of the relationship. The temporal proximity of the reporting and the alleged retaliation presents evidence of a causal connection. This is sufficient to present the issue of retaliation to the jury.

While the School District alleges a legitimate, non-discriminatory reason for removing her as an office aide, the remainder of the alleged acts of retaliation have no such basis. A reasonable jury could conclude that the retaliation was related to Nave's reporting of the sexual relationship with England.

**3) Section 1983**

Liability for constitutional violations by a municipality or state institution can only be conferred if it is demonstrated that an official policy or custom gave rise to a constitutional injury

to the plaintiff. <u>Murrell v. Sch. Dist. No. 1, Denver, Colo.</u>, 186 F.3d 1238, 1249-50 (10th Cir. 1999). In order to prevail on a claim of failing to investigate sexual harassment such that it formed a custom, "a plaintiff must prove (1) a continuing, widespread, and persistent pattern of misconduct by the state; (2) deliberate indifference to or tacit authorization of the conduct by policy-making officials after notice of the conduct; and (3) a resulting injury to the plaintiff." <u>Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.</u>, 511 F.3d 1114, 1125 (10th Cir. 2008)(citations omitted). With regard to Nave's equal protection claim, sufficient evidence exists in the record to indicate that a policy maker, Call, had knowledge of repeated instances of conduct by England which should have indicated an investigation of his actions was warranted. Moreover, none of the express policies and procedures in the School District addressed reporting or investigating teacher on student sexual harassment, giving rise to the suggestion that a custom or practice existed in the School District to not investigate this activity.

With regard to Nave's First Amendment claim, she is required to demonstrate (1) that she engaged in constitutionally protected activity; (2) the School District caused her to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the School District's adverse action was substantially motivated by Nave's constitutionally

protected conduct. <u>Worrell v. Henry</u>, 219 F.3d 1197, 1212 (10th Cir. 2000). The evidence as to the nature and extent of Nave's injury stemming from the School District's alleged retaliatory actions as a result of her reporting the relationship with England is subject to weighing and evaluation best left to a reasonable jury. Nave has presented sufficient evidence to overcome the threshold requirements on summary judgment.

The School District asserts it is entitled to summary judgment on Nave's procedural due process claim. While the Court agrees Nave referenced such a right in the Second Amended Complaint, the claim was not developed in this action and Nave did not address it in her response to the School District's summary judgment motion. As a result, it is deemed abandoned, if it was in fact ever asserted, in this action, entitling the School District to summary judgment on that claim.

To prevail on the claim for substantive due process, the Tenth Circuit has held that state officials can be liable for the acts of third parties where those officials "created the danger" that caused the harm. <u>Uhlrig v. Harder</u>, 64 F.3d 567, 572 (10th Cir.1995), cert. denied, 516 U.S. 1118 (1996). However, a claim brought under the "danger creation" theory must be predicated on "reckless or intentional injury-causing state action which 'shocks the conscience.'" <u>Id</u>. "'[I]t is not enough to show that the state increased the danger of harm from third persons; the [§] 1983

plaintiff must also show that the state acted with the requisite degree of culpability in failing to protect the plaintiff.'" _Id_. at 573 (citation omitted).  "That is, the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." _Id_. at 574. _See_ _Seamons v. Snow_, 84 F.3d 1226, 1236 (10th Cir. 1996).

This Court cannot conclude that the School District created the danger of England's sexual contact with Nave.  While their actions were arguably deficient and included allegations of post reporting retaliation, the required "conscience shocking" conduct **by the School District** is lacking in the record.  The School District is entitled to summary judgment on this claim.

**4) Negligence Claims**

Nave has asserted claims for negligent retention and supervision of England, negligence _per se_, negligent investigation, and negligent infliction of emotional distress.  The School District asserts that the England's actions were not foreseeable and, therefore, could not be the subject of a negligence claim against it.  Foreseeability is a question of fact for the jury and only becomes a question of law when one reasonable conclusion can be drawn from the facts.  _Atherton v. Devine_, 602 P.2d 634, 637 (Okla. 1979).  Different conclusions could be drawn from the actions of the School District in order to prevent or ameliorate the sexual contact by England which leaves the question of

foreseeability best for the jury.

The School District also contends England was not acting within the scope of his employment since he was not acting in good faith as required by the Oklahoma Governmental Tort Claims Act. Okla. Stat. tit. 51 §§ 152(11), 153. Nave's assertions of negligence, however, do not arise from *respondeat superior* liability conferred from England's actions. The negligent retention and supervision claim arises directly from the School District's actions or inactions. The negligence *per se* claim arises from the reporting of Nave's dreams by other employees. The negligent investigation claim stems from the School District's reaction to the observed activities of England toward Nave. The negligent infliction of emotional distress claim alleges that the School District had a duty to protect Nave and failed in that duty. As a result, the negligence claims will be maintained for trial.

## Claims Against Ralls

**1) Section 1983**

Ralls' liability under § 1983 cannot arise from *respondeat superior*. However, after the Supreme Court ruling in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009), the Tenth Circuit concluded that "[a] plaintiff may therefore succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained

of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation. Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)(citation omitted). Arguably, Ralls maintained or failed to maintain a policy that did not provide for the reporting of teacher on student sexual harassment and that led to the constitutional harm against Nave. The question is whether Ralls maintained the necessary state of mind to confer supervisory liability. That state of mind as set forth in both Iqbal and Dodds, is "purposeful discrimination." Dodds, 614 F.3d at 1198. This Court must conclude that the evidence is lacking for such a showing. While Ralls may been negligent in the maintaining of a policy for the School District, nothing in the record indicates that his actions were motivated by "purposeful discrimination" toward Nave. Moreover, Nave has not demonstrated that Ralls personally participated in any intentional discrimination such as to confer personal liability. As a result, Ralls is entitled to summary judgment on Nave's equal protection claim.

The required elements for a First Amendment claim has already been set forth above. Ralls' conduct consisted of allegedly ostracizing Nave by not speaking to her in the hall, allowing England to attend a basketball game, allowing England's wife to participate in ag events, and allegedly telling Maxwell that England would be allowed to return to school pending the

investigation, although he was never allowed to do so.  This conduct could be objectively viewed as "chilling a person of ordinary firmness" from engaging in the activity of reporting sexual harassment.  The jury will be permitted to consider Ralls' personal liability for the alleged retaliation in exercising Nave's First Amendment rights.

While Ralls seeks summary judgment on Fourteenth Amendment procedural and substantive due process claims, Nave does not respond to the assertions in her briefing.  As a result, the claims are deemed abandoned, entitling Ralls to summary judgment on those claims.

In her responsive brief, Nave curiously raises three claims for which summary judgment was not sought and which have not been properly addressed in the filings to this point.  Nave contends Ralls failed to train and supervise his subordinates in the response.  She also contends that Ralls maintained a custom of acquiescing in sexual harassment.  To the extent that these responses were set out as a response for summary judgment on the Fourteenth Amendment claim, this Court has found that Ralls lacked the requisite state of mind to maintain these claims under the prevailing authority.  Nave also sets out that she was subject to hostile environment harassment.  This claim has not been raised in the pleadings previously filed in this case and the inclusion in the responsive brief is not responsive to the Motion.  As such,

this Court finds Nave has not adequately asserted this claim to maintain it in this action.

## 2) Qualified Immunity

"Individual defendants named in a § 1983 action may raise a defense of qualified immunity," <u>Cillo v. City of Greenwood Village</u>, 739 F.3d 451, 459 (10th Cir. 2013), which "shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law," <u>Gann v. Cline</u>, 519 F.3d 1090, 1092 (10th Cir. 2008)(quotations omitted). Generally, "when a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." <u>Cillo</u>, 739 F.3d at 460.

The law is clearly established in the Tenth Circuit that retaliation for exercising constitutionally protected rights under the First Amendment to the Constitution which results in harm is violative of § 1983. <u>Worrell</u>, *supra*. The evidence taken in a light most favorable to Nave as the non-moving party indicates that Ralls may have acted in retaliation for the reporting of the relationship with England. As a result, Ralls is not entitled to qualified immunity at this stage of the proceedings.

IT IS THEREFORE ORDERED that the School District's Motion for

Summary Judgment (Docket Entry #79) is hereby **GRANTED**, in relation to Nave's claims for violations of her Fourteenth Amendment rights to procedural and substantive due process. The remainder of the School District's Motion is **DENIED**.

IT IS FURTHER ORDERED that Ralls' Motion for Summary Judgment (Docket Entry #80) is hereby **GRANTED**, in relation to Nave's claims for violations of her Fourteenth Amendment rights equal protection and to procedural and substantive due process. The remainder of Ralls' Motion, including his claim for qualified immunity with regard to Nave's First Amendment retaliation claim, is **DENIED**.

IT IS SO ORDERED this 6th day of December, 2018.

_____
KIMBERLY E. WEST
UNITED STATES MAGISTRATE JUDGE